# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTRELLA DEPPNER, <br><br> *Plaintiff*, <br><br> v. <br><br> SPECTRUM HEALTH CARE RESOURCES, INC., *et al.*, <br><br> *Defendants.* | Civil Action No. 1:17-cv-1275 (DLF) |

## MEMORANDUM OPINION

Estrella Deppner brings these Title VII and District of Columbia Human Rights Act (DCHRA) actions against her former employer, Spectrum Healthcare Resources, asserting that it discriminated against her based on national origin, subjected her to a hostile work environment, and retaliated against her for engaging in protected activity. She also brings a DCHRA action against her former supervisor, Jerl Huling, in his individual capacity, asserting that he did the same. Before the Court is defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Dkt. 11. For the reasons that follow, the Court will grant the motion.

## I. BACKGROUND[1]

Spectrum Healthcare Services—a government contractor tasked with providing healthcare services to various federal agencies—employed Deppner as a nurse coordinator. Am.

---

[1] The Court treats this motion as a motion for summary judgment with respect to Deppner's national origin discrimination claim under Title VII and as a motion to dismiss with respect to all other claims. Because the Court in resolving a motion to dismiss must treat plaintiff's "factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged," *Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018) (internal quotation marks and alterations omitted), the following sets forth the facts solely as they appear in Deppner's pleadings and the administrative record before the EEOC.

Compl. ¶¶ 4–5, Dkt. 6.  From February 4, 2015 to March 30, 2016, Deppner was placed at the Health Center for the Department of Veteran's Affairs.  *Id.* ¶ 4.  During that time, Deppner was directed to prepare a report on "bed bugs" discovered in the health center.  *Id.* ¶ 19.  Her supervisor, Jerl Huling, was "made aware" of the bed bugs and instructed Deppner not to discuss them with other nurses.  *Id.* ¶ 24.[2]

On the afternoon of April 27, 2016, Deppner reported to the Potomac Education Center, where she was asked to measure the blood pressure of two female patients—"Client 1" and "Client 2."[3]  *Id.* ¶¶ 9–13.  During Client 1's visit, Deppner called her "honey bunny" and told her she "looked good and was sexy."  *Id.* ¶ 11.  Deppner also asked her to "uncross her legs and arms" to avoid inaccuracies in the blood pressure reading.  *Id.*  When Client 1 failed to do so, Deppner "touched Client 1's knee" and repeated the request.  *Id.*  After the treatment, Client 1 filed a complaint against Deppner alleging that Deppner's use of the terms "'Honey Bunny' and 'Sexy' made her feel uncomfortable" and "amounted to 'sexual [sic] harassment."  *Id.*  ¶ 12.

Later that afternoon, Deppner told Client 2 she was "pretty" and "had a nice smile."  *Id.* ¶ 13.  Deppner began testing Client 2's blood pressure using a standard-sized cuff, which proved too small.  *Id.*  She then switched to the largest cuff available and administered the test.  *Id.*  The result was lower than usual, which Deppner explained could have been due to "diet, exercise, lack of sleep, dehydration" or "stress."  *Id.*  Client 2 responded "angrily" that if she needed

---

[2] During this conversation, Deppner also told Huling she overheard two nurses—her "friends"—talking about her in the "Jamaican language."  Am. Compl. ¶ 24.  One of them (apparently switching to English) referred to her as a "Filipino doll."  *Id.*  Deppner does not appear to consider that reference an insult; nor does she make any effort to tie it to her national origin discrimination claims.

[3] To protect the patients' privacy, the Court adopts plaintiff's convention of referring to them as Client 1 and Client 2.

advice, she would consult her doctor. *Id.* She filed a complaint against Deppner, in which she described Deppner's explanation for the low blood pressure result as a "lecture" that was both "demeaning and harassing." *Id.*

Spectrum reviewed the incidents and concluded that Deppner's conduct was "inappropriate, unprofessional and harassing." *Id.* ¶ 14. Huling called Deppner on April 29 and informed her she would be "suspended without pay until [Spectrum's] investigation is done." *Id.* Later that day, Deppner provided Spectrum with a statement in which she denied that her actions constituted harassment but admitted to calling Client 1 "Honey Bunny" and "sexy" and to "touching her on the knee" while asking the patient to "uncross her legs." Defs.' Mot. at Ex. 5, Dkt. 11-7 at 2–3.[4] Spectrum concluded that those actions violated Spectrum's policy on workplace harassment, and it suspended Deppner for five days. Am. Compl. ¶ 16. Deppner also alleges that Spectrum "planned" to terminate her effective June 6, 2016. *Id.* But she does not clarify whether (or when) this plan was revealed to her, or whether (or when) it was actually carried out. *Id.* Rather, Deppner suggests both that Spectrum "terminated her from the job" and that she "did not *want* to return to work" or "communicate with Spectrum," *id.* ¶ 18 (emphasis added), making it difficult to discern from the pleadings alone when—and why—Deppner's employment with Spectrum eventually ended.

---

[4] The copy of Deppner's statement furnished by defendants is appropriately considered regardless of whether the Court treats the motion as a motion for summary judgment or a motion to dismiss. "[T]he court may consider a document supplied by defendant in a motion to dismiss if 'the complaint necessarily relies' on the document and when . . . there is no genuine dispute that the document is what 'its proponent claims.'" *George v. Bank of America N.A.*, 821 F. Supp. 2d 299, 301 n.5 (D.D.C. 2011) (quoting Fed. R. Evid. 901(a)). Deppner herself alleges that she "provided a statement on April 29, 2016 denying that she did anything that could be conceived as harassment of either client." Am. Compl. ¶ 15. Because Deppner relies on that statement and does not dispute that the copy furnished by defendants "is what its proponent claims," the Court may consider Exhibit 5 without necessarily treating defendants' motion as one for summary judgment.

Deppner filed a Charge of Discrimination with the Equal Employment Opportunity Commission on October 25, 2016. Dkt. 11-13 at 2. When asked the basis for the alleged discrimination, she checked the boxes for "Race," "National Origin," and "Other" (specifying "Discriminatory Discipline"). *Id.* She did not check the box for "Retaliation." *Id.* In the sworn Statement of Particulars accompanying the charge, Deppner described her interactions with Client 1 and Client 2, and Spectrum's investigation of their complaints. *Id.* at 3–5. Deppner alleged that Spectrum suspended her without pay and "threatened to terminate [her] if similar conduct occurred again." *Id.* at 5. Deppner further explained she "fell out of communication with Spectrum" and was told by Huling that her position had changed to "PRN duty," meaning "Spectrum could assign her to work wherever there [wa]s a need and a vacancy appeared, if she was prepared to work." *Id.* at 6. From this, Deppner "concluded that she was terminated from her employment as reprisal to her complaint of Bed Bugs." *Id.* And she "believe[d] that Spectrum took this action because of her national origin, Filipino." *Id.*

Deppner filed this case in June 2017, asserting the following counts against Spectrum:

- Count I: National origin discrimination and hostile environment harassment under Title VII

- Count II: National origin discrimination and hostile environment harassment under the DCHRA

- Count III: Retaliation under Title VII

- Count IV: Retaliation under the DCHRA

In addition, Deppner brought the following count against Huling in his individual capacity:

4

- Count V: National origin discrimination, reprisal, and hostile environment harassment under the DCHRA

The defendants filed a joint Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. They argue that Deppner failed to exhaust administrative remedies as to her hostile work environment and retaliation claims, that Deppner failed to state a claim upon which relief can be granted as to all claims, and that Deppner failed to satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a)(2), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) as to all claims. They also argue that Spectrum "had a very strong and non-discriminatory reason for suspending Deppner and issuing her a Final Written Warning." Defs.' Reply at 13, Dkt. 20.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp.*, 550 U.S. at 570. Well-pleaded factual allegations are "entitled to [an] assumption of truth," *Iqbal*, 556 U.S. at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).

A motion to dismiss Title VII claims for failure to exhaust administrative remedies is properly analyzed under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Jones v. Bush*, 160 F. Supp. 3d 325, 337 (D.D.C. 2016), *aff'd*, No. 16-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017); *Mount v. Johnson*, 36 F. Supp. 3d 74, 80 (D.D.C. 2014). Moreover, a Rule 12(b)(6)

dismissal for failure to state a claim—including for failure to exhaust administrative remedies—"is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). As relevant here, the court may consider a plaintiff's EEOC documents. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (considering "the pleadings and undisputed documents in the record" while reaching the merits on a motion to dismiss); *Vasser v. McDonald*, 228 F. Supp. 3d 1, 11 (D.D.C. 2016) (taking judicial notice of informal and formal administrative complaints on a motion to dismiss); *Williams v. Chu*, 641 F. Supp. 2d 31, 35 (D.D.C. 2009) ("A plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice." (quotation marks and alteration omitted)).

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). In response to a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).

## III. ANALYSIS

Before the Court is defendants' motion to dismiss or, in the alternative, for summary judgment. Because the Court may dispose of Deppner's Title VII hostile work environment and retaliation claims by reviewing only her amended complaint and EEOC documents, the Court treats the motion as a motion to dismiss with respect to those claims. But because both parties have attached materials relevant to Deppner's Title VII national origin discrimination claim against Spectrum, the Court will treat the motion as a motion for summary judgment with respect to that claim. *See Zuver v. Sprigg*, No. CV 16-2505 (DLF), 2018 WL 3617308, at *4 (D.D.C. June 13, 2018) ("The court . . . may, a fortiori, convert the motion to dismiss into a motion for summary judgment only with respect to certain counts or issues").[5]

---

[5] Deppner argues that summary judgment is inappropriate because she "has not had an opportunity to engage in discovery . . . and has not presented any evidence." Pl.'s Opp'n at 6, Dkt. 13. But the Court disagrees. "The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede–Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006). In exercising that discretion, the "reviewing court must assure itself that summary judgment treatment would be fair to both parties." *Tele–Commc'ns. of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985). The parties "must be given a reasonable opportunity to present all the material that is pertinent," Fed. R. Civ. P. 12(d), but "[a] motion may be treated as one for summary judgment even if the parties have not been provided with notice or an opportunity for discovery if they have had a reasonable opportunity to contest the matters outside of the pleadings such that they are not taken by surprise," *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 86 (D.D.C. 2012). Here, Deppner has had more than a reasonable opportunity to present pertinent material outside the pleadings. Defendants requested summary judgment in the alternative and explicitly acknowledged the possibility that the Court could treat their motion as one for summary judgment. Defs.' Mot. at 2–3 n.2. And Deppner attached affidavits and public records to her opposition. *See* Dkt. 13-1, 13-2, 13-3, 13-4, 14. Deppner never once requested discovery in this case, and under the circumstances she will not be unfairly surprised by the Court's decision. *See, e.g.*, *Chambers v. Sebelius*, 6 F. Supp. 3d 118, 124 (D.D.C. 2013) (treating motion to dismiss as motion for summary judgment before discovery "because the defendant's motion was in the alternative for summary judgment and . . . the parties had the opportunity to submit and submitted materials in support in opposition" (internal quotation marks and alterations omitted)), *aff'd sub nom. Chambers v. Burwell*, 824 F.3d 141 (D.C. Cir. 2016).

### A. Exhaustion of Deppner's Hostile Work Environment and Retaliation Claims Under Title VII

Defendants first argue that Deppner failed to exhaust administrative remedies as required by Title VII. The Court agrees.

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotation marks and alterations omitted); *see also* 42 U.S.C. § 2000e-16(c). The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks and alteration omitted), and it "ensure[s] that the federal courts are burdened only when reasonably necessary," *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). In the Title VII context, failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it." *Bowden*, 106 F.3d at 437; *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").

"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Park*, 71 F.3d at 907 (internal quotation marks omitted). "Although it is true that the administrative charge requirement should not be construed to place a heavy technical burden on individuals untrained in negotiating procedural labyrinths, it is also true that the requirement of some specificity in a charge is not a mere technicality." *Id.* (internal quotation marks and citation omitted). After all, "[a] court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." *Id.*

Defendants do not dispute that Deppner has exhausted a claim based on national origin discrimination. But her EEOC charge cannot be stretched to include a claim for harassment or retaliation.

1. Hostile Work Environment

Deppner never once mentioned "harassment" or a "hostile work environment" to the EEOC. *See* Dkt. 11-13. Rather, she focused on a single discrete event—termination—and her "belie[f] that Spectrum took this action because of her national origin, Filipino." *Id.* at 6–7.

A plaintiff raising a hostile work environment claim, however, must allege *more* than a discrete act. The plaintiff must show that the "workplace is *permeated* with discriminatory intimidation, ridicule, and insult that is sufficiently *severe or pervasive* to alter the conditions of the victim's employment." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (emphasis added) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Thus, courts have repeatedly refused to find hostile work environment claims exhausted where a plaintiff alleges only a handful of isolated instances of potential discrimination before the EEOC. *See, e.g.*, *Panarello v. Zinke*, 254 F. Supp. 3d 85, 102 (D.D.C. 2017) (dismissing hostile work environment claim for failure to exhaust administrative remedies where plaintiff's "administrative complaint contain[ed] no mention of a hostile work environment but, rather, identifie[d] a series of discrete acts of alleged discrimination and retaliation"), *appeal filed*, No. 17-5148 (D.C. Cir. June 23, 2017); *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 180 (D.D.C. 2010) (dismissing plaintiff's hostile work environment claim for failure to exhaust administrative remedies where plaintiff's EEOC charge raised only "one discrete act of discrimination").

Further, the D.C. Circuit made clear in *Park v. Howard* that "[t]he bald statement that '[i]t is my belief that I was denied the opportunity for advancement in my career because of . . .

9

my national origin' . . . cannot be read to encompass a hostile work environment claim" for purposes of exhaustion. 71 F.3d at 908 (second alteration in original). Thus, Deppner's assertion that she "believes that Spectrum took this action because of her national origin, Filipino" cannot be read to encompass a hostile work environment claim. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992) ("Some detail, beyond a statement that 'I believe I have been discriminated against because of my race, Black' is necessary to allow the [EEOC] to perform its statutory duty [regarding a hostile work environment claim]."). As in *Park*, Deppner's "charge not only lacks the words 'hostile work environment,' but also lacks any factual allegations supporting such a claim." 71 F.3d at 908. Thus, Count I must be dismissed to the extent it relies on a theory of "hostile environment harassment." Am. Compl. at 9.

2. Retaliation

Deppner likewise failed to exhaust her retaliation claim. The only possible basis for construing Deppner's EEOC charge to encompass retaliation is a single line in which Deppner asserts she "was terminated from her employment as reprisal to her complaint of Bed Bugs." Dkt. 11-13 at 6. But that lone reference to "reprisal" could not have exhausted a retaliation claim. For one, Deppner was explicitly asked to provide the basis for her claim, and she checked the boxes for "race" and "national origin" while leaving unchecked the box for "retaliation." *Id.* at 2. More fundamentally, Deppner never alleged "reprisal" for *protected activity*, as required by Title VII. *See Broderick v. Donaldson*, 437 F.3d 1226, 1231 (D.C. Cir. 2006) (listing "engag[ing] in protected activity" as an essential element of a Title VII retaliation claim (internal quotation marks omitted)). "An activity is protected for the purposes of a [Title VII] retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235,

10

247 (D.D.C. 2011), *aff'd*, 573 F. App'x 1 (D.C. Cir. 2014) (internal quotation marks omitted). Disconcerting as bed bugs in the workplace may be, complaining about them does not constitute protected activity because it has nothing to do with "discriminatory treatment." *See id.* (explaining that "not every complaint entitles its author to protection from retaliation under Title VII" because the plaintiff "must demonstrate that he complained [to the employer] of some unlawful discrimination *based on his membership in a protected class*" (emphasis added)); *Hale v. Bd. of Trs. of S. Ill. Univ. Sch. of Med.*, 2017 WL 2695287, at *6 (C.D. Ill. June 22, 2017) (finding that "speak[ing] up about bed bugs" is "not protected activity" under Title VII because it "do[es] not relate to illegal employment discrimination"). Because Deppner failed to articulate a retaliation claim in her EEOC charge, she has failed to exhaust administrative remedies with respect to that claim. Consequently, the Court must dismiss Count III.

    B.    **Deppner's National Origin Discrimination Claim**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). An employee can prove unlawful discrimination with either direct or indirect evidence. An employee has direct evidence of unlawful discrimination if, for example, the employer "overtly refer[s]" to the employee's protected trait when making an unfavorable employment decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring in the judgment). The indirect method of proof, on the other hand, requires the employee to establish a prima facie showing of discrimination, which can then be rebutted by the employer. The elements of a prima facie case of discrimination are: (1) the plaintiff is part of a protected class; (2) the plaintiff suffered a cognizable adverse employment action; and (3) the action gives rise to an inference of discrimination. *Walker v. Johnson*, 798

11

F.3d 1085, 1091 (D.C. Cir. 2015). At summary judgment, however, "the question whether the plaintiff in a disparate treatment discrimination suit actually made out a prima facie case is almost always irrelevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008). That is because "by the time the district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision." *Id.* at 493. If so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Id.* at 494. Instead, the court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.*

Deppner has not provided direct evidence of discrimination but instead points to the circumstances surrounding her suspension and eventual departure from Spectrum. Defendants challenge Deppner's prima facie case on multiple grounds.[6] But because defendants have also provided a non-discriminatory reason for disciplining Deppner, Defs.' Reply at 11–13,[7] the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady*, 520 F.3d at 494. Instead, the Court turns to the "central question" of whether

---

[6] Specifically, they argue that Deppner has failed to allege satisfactory performance and adverse employment action and that her complaint does not meet the "plausibility" requirement of *Iqbal* and *Twombly*. *See* Defs.' Mot. at 10–12, 16–17.

[7] Defendants primarily discuss Spectrum's non-discriminatory reason as a challenge to Deppner's prima facie case, arguing that she failed to allege that "her job performance was satisfactory." Defs.' Mot. at 10. Satisfactory performance, however, is not a necessary element of national origin discrimination. *See Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (listing the elements). Thus, her job performance is better addressed as a potential "legitimate, non-discriminatory reason" for Spectrum's actions, as defendants suggest in their reply. Defs.' Reply at 11; *see also id.* at 13.

Deppner has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against" her. *Id.*

Defendants' non-discriminatory reason for disciplining Deppner is straightforward: Spectrum received complaints from two patients about Deppner's behavior, and Deppner admitted in writing to "the most egregious" of the patients' accusations. Defs.' Reply at 13. To demonstrate that reason, Spectrum has attached copies of both patients' complaints, Dkt. 11-3, 11-4, a declaration by Huling, Dkt. 11-5, a series of emails and letters exchanged between Huling and Deppner, Dkt. 11-6, 11-7, 11-9, 11-11, 11-12, an Employee Corrective Counseling Form, Dkt. 11-8, and Deppner's response to that form, Dkt. 11-10.

Those documents clearly establish that Spectrum disciplined Deppner because of the complaints it received from Client 1 and Client 2. The Employee Corrective Counseling Form sent to Deppner is particularly revealing. In it, Spectrum explains that Client 1 complained about Deppner's use of the words "Honey Bunny" and "sexy" and the fact Deppner "touched her leg in a way that made the patient feel uncomfortable." Dkt. 11-8 at 2. Spectrum also explains that Client 2 complained that she felt "embarrassed" when Deppner "insisted upon utilizing a small blood pressure cuff," that she felt "uncomfortable" with being called "pretty," and that she "felt like she received a lecture" regarding issues "unrelated" to the purpose of her visit. *Id.* at 3. To rectify the issues raised in the patients' complaints, Spectrum required Deppner to take certain "action steps for improvement." *Id.* Those steps consisted of reviewing Spectrum's Behavior, Conduct, and Performance Guidelines, reviewing Spectrum's policy on Employee and Workplace Harassment, and refraining from treating "unrelated issues or providing unsolicited

13

opinions" in the future. *Id.* If Deppner failed to take those steps, her dismissal would be "recommended." *Id.*

Deppner admits to nearly all of these facts: that she treated Clients 1 and 2 on April 27, Am. Compl. ¶¶ 9, 11, 13; that she called Client 1 "Honey Bunny" and "sexy," *id.* ¶ 11; that she "touched Client 1's knee", *id.*; that Client 1 filed a complaint stating Deppner's use of the words "Honey Bunny" and "Sexy" made her feel uncomfortable and "amounted to 'sexual [sic] harassment," *id.* ¶12; that Deppner used a small blood pressure cuff on Client 2 before switching to a larger one, *id.* ¶ 13; that Deppner called Client 2 "pretty," *id.*; that Client 2 responded "angrily" when Deppner provided unsolicited advice, *id.*; that Client 2 filed a complaint describing Deppner's treatment as "demeaning and harassing," *id*; that Spectrum reviewed the April 27 incidents and concluded Deppner's conduct was "inappropriate, unprofessional and harassing," *id.* ¶ 14; that Huling informed Deppner she would be suspended without pay pending the results of an internal investigation, *id.*; and that Spectrum ultimately concluded Deppner's actions violated its policy on workplace harassment, *id.*

Deppner adds merely one twist: that despite all those facts, she "believes" Spectrum *really* disciplined her "because of her national origin, Filipino." *Id.* ¶ 33. To support that allegation, Deppner provides two affidavits: her own and that of a co-worker, Karyn Miller. *See* Dkt. 21, 22 (redacted versions supplied by defendants with permission of the Court). Deppner's affidavit, however, contradicts her own complaint. She asserts that she doesn't "recall referring to [Client 1] as being sexy," Dkt. 21 ¶ 5, and that she "believe[s] Spectrum manufactured [the two patients'] complaints" as punishment for "complaining to the Veteran's Administration about bed bug infestation," *id.* ¶ 11. But even if Spectrum had "manufactured" the complaints for this purpose, it would not make a difference. "[A] plaintiff cannot survive summary

14

judgment merely by showing that the employer was motivated by a *different* nondiscriminatory reason"—like complaining about bed bugs. *Moses v. Kerry*, 110 F. Supp. 3d 204, 210 (D.D.C. 2015), *aff'd*, No. 15-5241, 2016 WL 1272943 (D.C. Cir. Feb. 8, 2016). "[S]uch a plaintiff shoots himself in the foot by demonstrating that the real explanation for the employer's behavior is not discrimination, but some other motivation." *Id.* (internal quotation marks omitted). Thus, Deppner's affidavit would be legally irrelevant even if it did not contradict her own complaint.

Miller's affidavit fares no better. It explains that Miller was the "charge nurse" at Potomac Education Center on April 27, Dkt. 22 ¶ 1, that neither Client 1 nor Client 2 complained *to her* about the treatment they received, *id.* ¶ 5, and that such complaints would "[n]ormally" be made to her so that she could "address concerns at the lowest level and promptly," *id.* ¶ 7. She further explains that she never heard anything *from Spectrum* regarding the complaints. *Id.* ¶ 6. And she states her "opinion" that "Deppner did not engage in inappropriate communications or contact with the two patients." *Id.* ¶ 9. Presumably, Miller's testimony is meant to show two things: *first*, that the complaints never existed; and *second*, that Deppner acted appropriately on April 27. But it fails at the first, and the second is irrelevant.

First, Deppner herself alleged that both Clients filed complaints about her performance, Am. Compl. ¶¶ 12, 13, and that Spectrum "conducted a review of these incidents and concluded that Ms. Deppner's conduct was inappropriate, unprofessional and harassing," ¶ 14. But even if that were not the case, Miller's testimony that patients "[n]ormally" complain to her instead of Spectrum is not nearly enough to rebut defendants' evidence. Defendants have provided, among other things, purported copies of the patients' actual complaints, *see* Dkt. 11-3, 11-4, and two written statements (whose authenticity is undisputed) in which Deppner confirms the critical details of April 27 and objects only to the *characterization* of her conduct as improper, *see* Dkt.

15

11-7 at 2–4; Dkt. 11-10 at 5–6. In a letter to Huling, Deppner says that she "suspected that [she] would receive feedback from these 2 patients, because they were obviously upset." Dkt. 11-7 at 2. And in her response to the corrective counseling form, she does not challenge any of the "Facts and Events" recounted by Spectrum but only Spectrum's "one sided" focus "on the statements of the 2 patients." Dkt. 11-10 at 5. In light of Deppner's own written statements admitting to the conduct for which she was disciplined and predicting and acknowledging the patients' complaints, Miller's affidavit could not lead a reasonable juror to conclude that those complaints were "manufactured" as a pretext for discrimination.

Second, Miller's "opinion" about Deppner's conduct is irrelevant because "[t]he question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying sexual harassment incident occurred." *Brady*, 520 F.3d at 496 (affirming summary judgment for defendant in Title VII action where plaintiff's "only argument for discrediting the employer's asserted non-discriminatory reason [wa]s his contention that the underlying sexual harassment incident never occurred," *id.* at 495–96). Miller's characterization of Deppner's performance—which she does not claim to have observed—at most suggests Spectrum might have been wrong to conclude Deppner's conduct was improper. It does not show that Spectrum acted dishonestly or unreasonably in reaching that conclusion.

To be sure, a Title VII plaintiff has "multiple ways to show that the employer's stated reason for the employment action was not the actual reason." *Id.* at 495. A plaintiff can "produce evidence suggesting that the employer treated other employees of a different race . . . or national origin more favorably in the same factual circumstances" or "demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the

16

employment decision." *Id.* A plaintiff can also point to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Id.* at 495 n.3. Deppner has taken none of those steps. She has merely stated her "[b]elief" that "Spectrum manufactured [the] complaints" against her for the different but equally non-discriminatory purpose of punishing her for complaining about bed bugs. Dkt. 21 ¶ 11. In the face of defendants' evidence that Spectrum disciplined Deppner because it received complaints about her treatment of Client 1 and Client 2, Deppner has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against" her. *Brady*, 520 F.3d at 494. The Court will therefore grant defendants' motion for summary judgment with respect to Count I.

### C. Deppner's DCHRA Claims

The only remaining counts are Deppner's DCHRA claims against both defendants. The Court has an "affirmative obligation" to consider its own jurisdiction, *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996), and it may do so sua sponte at any point during litigation. In her Amended Complaint, Deppner relies on the subject-matter jurisdiction provided by 28 U.S.C. § 1343 and 28 U.S.C. § 1331 for her Title VII claims and on the supplemental jurisdiction provided by 28 U.S.C. § 1367(a) for her DCHRA claims.

When this case began, the Court had supplemental jurisdiction over Deppner's D.C. claims because they derived from the same "nucleus of operative fact" as her federal claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a). But when a court dismisses all federal claims in a suit, it has the *discretion* to exercise—or decline to exercise—supplemental jurisdiction over any state-law claims that remain. *United Mine*

*Workers v. Gibbs*, 383 U.S. at 726 (describing supplemental jurisdiction as a "doctrine of discretion" and not of "right"); *see also* 28 U.S.C. § 1367(c)(3); *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 60 (D.D.C. 2011) (dismissing all federal claims and declining to exercise supplemental jurisdiction over remaining state-law claims).

In exercising that discretion, courts consider "judicial economy, convenience and fairness to litigants." *United Mine Workers*, 383 U.S. at 726. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (applying *Carnegie-Mellon Univ.* to the current version of § 1367(d)).

In this case, the factors weigh against retaining Deppner's state-law claims. The case has not progressed beyond defendants' first motion, and the Court has not developed any familiarity with Deppner's state-law claims. Moreover, Deppner will not be prejudiced in any way by dismissal. As the Supreme Court recently recognized—specifically in the context of District proceedings—§ 1367(d)'s tolling provision not only provides for a thirty-day grace period for refiling in state court after dismissal; it also stops the clock on any otherwise-applicable limitations period during the pendency of the federal-court suit. *See Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018). Because the Court declines to exercise supplemental jurisdiction over Deppner's state-law claims, it will dismiss Counts I, IV, and V for lack of subject-matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' Motion to Dismiss Count I to the extent it advances a harassment or hostile work environment claim.  The Court grants defendants' Motion to Dismiss Count III.  The Court grants defendants' Motion for Summary Judgment regarding Count I.  And the Court dismisses Counts II, IV, and V for lack of subject-matter jurisdiction.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: September 11, 2018